In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1572

FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for Founders Bank,

*Plaintiff-Appellant*,

*v.*

CHICAGO TITLE INSURANCE COMPANY and
CHICAGO TITLE AND TRUST COMPANY,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-05198 — **Andrea R. Wood**, *Judge*.

ARGUED APRIL 2, 2021 — DECIDED AUGUST 31, 2021

Before WOOD, HAMILTON, and KIRSCH, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This case arose from the fraudulent financing of purchases of four properties in Chicago back in 2006. The borrowers concealed their lack of equity from the lender. All defaulted, and the lending bank later went into receivership. As receiver for that bank, the FDIC brought this suit against the title insurance company that conducted the

fraudulent closings and an appraisal company that aided the transactions.

The FDIC settled with the appraisal company and went to trial against the title insurance company, winning a verdict but for less than the FDIC believes was warranted. The FDIC's appeal raises three issues. The first is whether the district court erred by denying prejudgment interest to the FDIC. That issue requires us to address a somewhat Delphic statutory provision telling courts to award "appropriate" prejudgment interest in FDIC receivership cases that blend federal and state law. See 12 U.S.C. § 1821(*l*). We conclude that the statute gave the district court authority to exercise its discretion and to look to state law for guidance, and we find no legal error or abuse of discretion in denying prejudgment interest. The second and third issues are narrower and more specific to this case. Our second conclusion is that, because of difficult causation issues, the district court did not abuse its discretion in refusing to amend the jury verdict to add more damages. Our third, however, is that the district court erred in giving the title company a $500,000 setoff for the appraisal company's settlement. We affirm the judgment for the FDIC as far as it went but remand with instructions to add the setoff amount back into the judgment.

I.  *Factual and Procedural History*

   A.  *The Ill-Fated Loans*

In 2006, Founders Bank made loans to finance four purchases of Chicago properties that the buyers planned to

convert into condominiums.[1] In making the loans, Founders relied on real estate appraisals by Jo Jo Real Estate Enterprises, which did business as Property Valuation Services LLC ("PVS"). Chicago Title, acting as escrow trustee, conducted the closings and reported the transactions to Founders.[2]

But the loans had been obtained by deception, leading Founders to lend money to buyers who had little or no real equity in the properties. The scheme worked this way. For each purchase financed by Founders, the same property had changed hands earlier the same day at a much lower price paid to the original owner. When Founders funded its loan later the same day, it had been misled to understand that the buyer/borrower was putting in substantial equity, but there was only phantom equity.

For example, on February 13, 2006, the North LaSalle property first sold for $2.4 million. One hour later, it was resold for $3.1 million. The second transaction was the only one reported to Founders. Because Founders had agreed to finance 80 percent of the purchase price and 100 percent of budgeted construction costs to convert each apartment building into condominiums, the double sale allowed the purchaser to use the funds from the higher-priced transactions to pay off the (very) short-term loan for the first purchase and

---

[1] The property addresses were: 2218–24 North Bissell Street; 851 North LaSalle Street; 5408-10 North Campbell Street; and 5412–14 North Campbell Street.

[2] The FDIC's suit named two seemingly distinct entities, Chicago Title Insurance Company and Chicago Title and Trust Company, but our record and the parties' briefs do not distinguish between the two. We refer to them jointly as "Chicago Title" and also do not distinguish between them.

thus to fund the actual purchase without investing real equity in the property. Chicago Title conducted all of the closings. It reported only the second transactions to Founders, hiding from Founders the scheme to use phantom equity.

The buyers never completed the proposed condominium conversions and soon defaulted on their loans. In 2008, Founders foreclosed on the four properties, then purchased them with "partial credit bids" at foreclosure sales based on new appraisals by PVS. Founders later obtained deficiency judgments against the borrowers and their guarantors.

Only after it obtained the deficiency judgments did Founders learn about the secret double sales and the phantom equity. Founders also discovered that PVS's appraisals at both the time of funding and the later foreclosures overstated the values of the properties.

B. *Procedural History*

Founders then ran into broader problems and was closed by its state regulator on July 2, 2009. The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver under 12 U.S.C. § 1821(d)(2)(A). In 2012, the FDIC filed this suit against Chicago Title for breaches of contract, breaches of fiduciary duty, negligence, and negligent misrepresentations, and against PVS for separate breaches of contract and negligent misrepresentations.

Before trial, the district court granted Chicago Title's motion for partial summary judgment, concluding that the "credit bid rule" capped damages at the sum of deficiency

judgments obtained by Founders after the foreclosure sales.[3] The FDIC then reached a settlement with PVS, which agreed to pay the FDIC $500,000. The FDIC's case went to trial against Chicago Title. In a pretrial order, Chicago Title argued that it was entitled to a setoff based on the settlement between the FDIC and PVS. The FDIC filed a motion in limine to bar Chicago Title from arguing for a setoff at trial, which the court granted.

At trial, the FDIC presented evidence of the amounts it lost, net of its credit bids, totaling $3,790,695.[4] Chicago Title argued that its conduct in the double transactions was not a proximate cause of Founders' and the FDIC's losses, which it argued were caused instead by intervening events like unexpected rising construction costs and a broader downturn in the condominium market in the Great Recession of 2008–09.

---

[3] A deficiency judgment should be for the difference between the foreclosure sale price and the debt owed. As the district court explained in this case, the "credit bid rule" limits the measure of loss of a mortgagee that obtains the mortgaged property in a foreclosure sale to the deficiency judgment. *F.D.I.C. v. Chicago Title Ins. Co.*, 2015 WL 5276346, at *4 (N.D. Ill. Sept. 9, 2015). Where, as here, the property is obtained for a partial credit bid (less than the full value of the debt owed), and "there is no fraud or irregularity in the foreclosure proceeding, the amount of the lender's successful credit bid is deemed to be the conclusive measure of the property's value for purposes of determining the value of any deficiency." *Id.* (quotation and citation omitted). The lender is then "limited to recovering the sum of the deficiency judgment and collaterally estopped from claiming greater losses." *Id.* (citation omitted).

[4] The FDIC was not allowed to present the deficiency judgments themselves at trial, so it proved the losses through testimony and other evidence. The total loss figure here is approximately $90,000 less than the sum of the judgments because the FDIC voluntarily reduced the amount to reflect the amount above its credit bids realized on final sales.

The jury found Chicago Title liable for breach of contract, breach of fiduciary duty, negligence, and negligent misrepresentation. The jury verdict included a finding that Chicago Title's misconduct was a proximate cause of Founders' injuries. The jury awarded the FDIC approximately the same amount of the established deficiency losses for the two North Campbell property loans, but it awarded less for the other two loans, for a total verdict of $1,450,000 for the four properties.[5]

The FDIC's appeal challenges three post-verdict decisions by the district court. First, the FDIC asked the court to award prejudgment interest under 12 U.S.C. § 1821(*l*) and Illinois law, which the court denied. Second, the FDIC asked the court to amend the judgment to award it the full amount of all four deficiency judgments, which the court also denied. Third, despite the pretrial rulings, Chicago Title asked the court to grant it a setoff, deducting $500,000 from the jury verdict to account for the money the FDIC received from its settlement with PVS. The court granted that setoff.

## II. *Jurisdiction*

Founders' claims originally arose under state law, but the district court properly exercised federal-question jurisdiction pursuant to 12 U.S.C. § 1819(b)(2)(A) and 28 U.S.C. § 1331 because the FDIC stepped into the shoes of Founders as its receiver. The FDIC timely appealed the district court's partial

---

[5] The jury found that Founders was 50 percent contributorily negligent but also found that Chicago Title's conduct was willful and wanton, which negated the contributory negligence finding under the court's instructions. The district court ultimately resolved a dispute over the relevant jury instructions on this point. The parties have not presented any of those issues on appeal.

final judgment of March 10, 2020. We exercise jurisdiction un-
der 28 U.S.C. § 1291, with an assist from Rule 54(b).[6]

III. *Prejudgment Interest*

More than ten years passed between the fraudulent trans-
actions and the district court's entry of judgment against Chi-
cago Title. The FDIC sought prejudgment interest under both
federal law, 12 U.S.C. § 1821(*l*) (for all claims), and Illinois law
(for the fiduciary duty claim). The district court denied pre-
judgment interest based on its interpretation of the federal
statute and Illinois law.

Whether § 1821(*l*) mandates a grant of prejudgment inter-
est is a question of law that we review de novo. *Joseph v. Sasa-
frasnet, LLC*, 734 F.3d 745, 747 (7th Cir. 2013). The district court
said it does not, and the court then exercised its discretion un-
der § 1821(*l*) and state law to deny prejudgment interest. We
review that decision for an abuse of discretion. E.g., *Shott v.
Rush-Presbyterian-St. Luke's Medical Ctr.*, 338 F.3d 736, 745 (7th
Cir. 2003), citing *McRoberts Software, Inc. v. Media 100, Inc.*, 329
F.3d 557, 572 (7th Cir. 2003).

When the FDIC steps in to pursue claims as receiver for a
financial institution, federal courts confront an unusual blend
of federal and state law. We consider first whether the district
court correctly interpreted the federal statute to allow it dis-
cretion to deny prejudgment interest. We then turn to Illinois

___

[6] When the FDIC filed its notice of appeal, Chicago Title still had a
claim pending against a third-party defendant. Under Federal Rule of
Civil Procedure 54(b), the district court entered a partial final judgment in
favor of the FDIC in the amount of $945,643.56. While this appeal was
pending, that remaining third-party claim was dismissed, resolving all
claims by all parties.

law of prejudgment interest, particularly as it applies to the claim against Chicago Title for breach of fiduciary duty.

A. *Prejudgment Interest Under 12 U.S.C. § 1821(l)*

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, known as FIRREA, authorizes the FDIC to act as receiver for failing insured depository institutions and prescribes the damages that may be available to it when, as a receiver, it pursues claims against other parties. FIRREA includes this instruction: "In any proceeding related to any claim against an insured depository institution's director, officer, employee, agent, attorney, accountant, appraiser, or any other party employed by or providing services to an insured depository institution, recoverable damages determined to result from the improvident or otherwise improper use or investment of any insured depository institution's assets shall include principal losses and appropriate interest." 12 U.S.C. § 1821(*l*).

### 1. *"Appropriate" Prejudgment Interest*

The FDIC argues that the phrase "shall include principal losses and appropriate interest" mandates some award of prejudgment interest, even if it leaves some room for case-by-case adjustments for rates and time periods. Chicago Title argues that "appropriate" gave the district court discretion to decide whether prejudgment interest should be awarded at all. The district court agreed with Chicago Title, and so do we.

As in any statutory construction case, we start with the text and, unless otherwise indicated, assume that statutory terms are generally interpreted in accordance with their ordinary meaning. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013), quoting *BP America Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006); see

also 1 William Blackstone, Commentaries on the Laws of England § 2, p. 44 [*59] (Wayne Morrison ed, 2001) ("Words are generally to be understood in their usual and most known signification."). The text of the statute instructs that "damages … shall include … appropriate interest." 12 U.S.C. § 1821(*l*). The words "shall include" generally indicate a mandatory instruction: a court *shall* include something. But the word "appropriate" is a deliberately vague indication that some degree of discretion and judgment is called for. Read together, the words "shall include … appropriate interest" do not provide a clear answer for our question about whether interest was required in this case.

Blackstone provided instructive commentary on this statutory interpretation issue:

> The fairest and most rational method to interpret the will of the legislator, is by exploring his intentions at the time when the law was made, by signs the most natural and probable. And these signs are either the words, the context, the subject matter, the effects and consequence, or the spirit and reason of the law.

Blackstone, § 2, p. 43 [*59]. When the statutory text does not provide a definitive answer, careful application of this "all-of-the-above" approach to statutory interpretation may help produce the best-informed interpretation. A judge who seeks guidance from every reliable source has less discretion than one who insists on focusing only on statutory text. Aharon Barak, Judicial Discretion 62 (Y. Kaufmann transl. 1989) (Justice of Supreme Court of Israel), quoted in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 133 (2001) (Stevens, J., dissenting).

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019), quoting *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (quotation omitted); see also *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which … language is used and the broader context of the statute as a whole.") (quotation omitted); Blackstone, § 2, p. 44 [*60] ("If words happen to be still dubious, we may establish their meaning from the *context*. … Of the same nature and use is the comparison of a law with other laws … that have some affinity with the subject, or that expressly relate to the same point.").

Looking to similar federal statutes, we find it instructive that other statutes providing that interest "shall" be an element of damages do not include the limitation "appropriate." See, e.g., 28 U.S.C. § 1961(a) (post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court"); 7 U.S.C. § 2564 (in infringement of plant variety protection, the court "shall award damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the variety by the infringer, together with interest and costs as fixed by the court"). And, as the Fourth Circuit noted in a case on § 1821(*l*), "Congress knows how to specify rates of interest." *Grant Thornton, LLP v. F.D.I.C.*, 435 F. App'x 188, 208 (4th Cir. 2011), citing 42 U.S.C. § 9607(a)(4) (setting forth damages in CERCLA cases and explaining what damages the interest applies to and the dates of accrual, and referring to specific rates of interest). In context, and in comparison with other similar

laws, it is clear that Congress could have omitted the word "appropriate" from § 1821(*l*) if it actually intended for an award of prejudgment interest to be mandatory.

We may also consider the "effects and consequence" of the interpretation of the statute. Blackstone, § 2, p. 44 [*60]. See, e.g., *King v. Burwell*, 576 U.S. 473, 492 (2015) (examining text within broader "statutory scheme" and concluding that "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law") (quotation omitted). If we read "shall include … appropriate interest" to mean that it is *mandatory* for courts to award prejudgment interest, the obvious consequence would be that every damages award under § 1821(*l*) would have to include prejudgment interest. This seems improbable: we can imagine situations where it would not be reasonable or equitable to award prejudgment interest. See *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 439 (7th Cir. 1989) (Ripple, J., concurring), citing *General Motors*, 461 U.S. at 656–57 (sometimes appropriate to limit or deny prejudgment interest). Furthermore, a "mandatory" reading essentially reads the word "appropriate" out of the statute.

As a matter of federal law, this court has long applied a presumption in favor of awarding prejudgment interest to victims of federal law violations. *Gorenstein Enters.*, 874 F.2d at 436 (opinion for court) ("Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay."); see also *Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997) ("Doubtless judges have discretion to exercise when deciding whether to award prejudgment interest … . Discretion must be exercised according to law, which means that prejudgment interest should be

awarded unless there is a sound reason not to do so."). This is because "[c]ompensation deferred is compensation reduced by the time value of money," so prejudgment interest is usually an ingredient of full compensation.

But presumptive does not mean mandatory, and here we apply not a general principle but a directly applicable statute using the slippery phrase "appropriate interest." Case law provides only limited guidance on this question under § 1821(*l*). The FDIC's argument stretches beyond its limits *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 (1983), where the Court held that prejudgment interest is presumptively available under a different statute, 35 U.S.C. § 284, regarding patent infringement and concluded that in such cases, interest "should ordinarily be awarded." See also *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 555 (Fed. Cir. 1984) (explaining that *General Motors* confirmed that "prejudgment interest 'should ordinarily be awarded'"). Similarly, *United States v. Monsanto*, 491 U.S. 600, 607 (1989), applied a different statute addressing criminal forfeiture, 21 U.S.C. § 853, which instructed that the court "shall order" forfeiture and did not include the ambiguous qualifier "appropriate." The court in *F.D.I.C. v. Ching*, 2017 WL 2225094, at *3–5 (E.D. Cal. May 22, 2017), found that § 1821(*l*) authorizes an award of prejudgment interest at the court's discretion: "Even though the statutory language of section 1821(*l*) permits the inclusion of pre-judgment interest, whether to actually award such interest under this section remains a matter of judicial discretion." And the court in *F.D.I.C. v. Moll*, 848 F. Supp. 145, 148 (D. Colo. 1993), only asserted with no explanation that the FDIC was entitled to prejudgment interest under § 1821(*l*) and turned directly to a discussion of the appropriate interest rate.

As the Fourth Circuit noted in *Grant Thornton*, "[t]here is a dearth of case law applying this statute." 435 F. App'x at 206. We agree with the Fourth Circuit's assessment in *Grant Thornton* that the word "appropriate" "is best read as a limitation as to when prejudgment interest should be provided." *Id.* at 208. "[W]hile Congress used the language 'shall,' it also included the word 'appropriate' for a purpose." *Id.* at 207.

Even if federal law presumes prejudgment interest should be awarded for financial damages in most situations, § 1821(*l*) addresses an unusual situation that makes it easy to understand why Congress added the "appropriate" qualifier. The statute applies when the FDIC steps into the shoes of a failed bank as receiver. But for the FDIC's role under FIRREA, the bank that would have been the proper plaintiff in such cases would often have pursued relief under state law. That's true in this case, with claims for breach of contract, negligence, and breach of fiduciary duty. Congress could easily have concluded that in such cases arising all over the nation under the law of every state, one size would not comfortably fit all. The types and merits of different cases and significant variation in states' laws governing prejudgment interest defy an attempt to write a precise but generally applicable rule. "Appropriate" makes for a workable delegation to courts to exercise sound discretion. Accordingly, we read the words "shall" and "appropriate" to give effect to both: the district court shall consider only that interest which is appropriate, leaving courts to consider all relevant circumstances, which may include the state law that would have governed the case but for the FDIC's role as a receiver.[7]

---

[7] The partial dissent proposes a different interpretation for FIRREA's instruction that, in such receivership cases, damages "shall include …

2.  *Reliance on State Law*

Saying that the court has discretion does not decide how the court should go about exercising it. The district court looked to Illinois law to determine whether prejudgment interest was appropriate, noting that the claims against Chicago Title are all state-law claims brought under federal jurisdiction because the FDIC stepped in as receiver. The FDIC argues that the court erred in relying on state law.

Where the FDIC steps in as a receiver to pursue in federal court claims that first arose under state law, FIRREA instructs courts to apply an unusual blend of state and federal law. The Supreme Court has explained generally that FIRREA leaves the FDIC "to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise." *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 86–87 (1994). The FIRREA provision on interest, § 1821(*l*), offers little substantive guidance on prejudgment interest. With the guidance of *O'Melveny*, it is natural for federal courts addressing FIRREA claims that originally arose under state law to turn, at least for guidance in exercising discretion, to the state law that would have applied absent the FDIC receivership. Accordingly, the district court properly looked to

---

appropriate interest." The dissent ultimately proposes to require or at least allow a district court to look to state law to decide *how much* prejudgment interest to award, but to treat some amount of prejudgment interest by definition as *always* "appropriate," so that an award of zero should be prohibited. See *post* at 32–33. That would be an odd rule, at least where state law would direct that zero prejudgment interest is appropriate. More fundamental, though, as a matter of statutory interpretation, if that rather complex rule were what Congress had intended, "shall include … appropriate interest" is neither a clear nor a likely way to have expressed it.

Illinois state law for guidance on whether prejudgment inter-
est was appropriate here.[8]

The district court explained:

> This Court therefore looks to Illinois law for
> guidance in exercising its discretion to award
> prejudgment interest. In Illinois, "prejudgment
> interest is generally recoverable only when an
> express agreement between the parties exists or
> if it is authorized by statute." *Movitz v. First Nat'l
> Bank of Chi.*, 982 F. Supp. 566, 568 (N.D. Ill. 1997).
> However, in proceedings brought in equity "a
> court may be justified in awarding interest
> based on equitable grounds." *Kouzoukas v. Ret.
> Bd. of Policemen's Annuity & Benefit Fund of City
> of Chi.*, 917 N.E.2d 999, 1015 (Ill. 2009). The FDIC
> does not assert that there is any contractual or
> statutory basis for the award of prejudgment in-
> terest here. Thus, the Court confines its inquiry

---

[8] When exercising diversity jurisdiction or supplemental jurisdiction over state-law claims, of course, federal courts routinely look to state law to determine whether prejudgment interest is appropriate and if so, at what rates and for what time. E.g., *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 981 F.3d 618, 634–35 (7th Cir. 2020) (applying Indiana law); *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1405 (7th Cir. 1997) ("In diversity cases governed by *Erie*, federal courts look to state law to determine the availability of (and the rules for computing) prejudgment interest.") (quotation and citation omitted); *Movitz v. First Nat'l Bank of Chicago*, 982 F. Supp. 566, 568 (N.D. Ill. 1997) ("This … is a diversity case, controlled by Illinois law."), rev'd on other grounds, 148 F.3d 760 (7th Cir. 1998).

> to possible equitable bases for awarding pre-
> judgment interest.

*F.D.I.C. v. Chicago Title Ins. Co.*, 2019 WL 1437873, *10 (March 31, 2019). We agree, so we turn to possible equitable bases for prejudgment interest.

B.  *Equitable Bases for Prejudgment Interest*

The FDIC contends that Illinois law calls for prejudgment interest on its claims against Chicago Title for breach of fiduciary duty. Illinois law treats a claim for breach of fiduciary duty as an equitable claim, and Illinois law allows for an equitable award of prejudgment interest in such cases. E.g., *Prignano v. Prignano*, 934 N.E.2d 89, 109 (Ill. App. 2010) ("[F]or causes of action sounding in equity, 'the allowance of interest lies within the sound discretion of the judge and is allowed where warranted by equitable considerations.'"), quoting *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 257, 856 N.E.2d 389, 412 (2006).

The rationale for awarding prejudgment interest in such cases is to "make the injured party complete by forcing the fiduciary to account for profits and interest he gained by the use of the injured party's money." *In re Estate of Wernick*, 127 Ill. 2d 61, 87, 535 N.E.2d 876, 888 (1989). The district court reviewed Illinois cases on equitable awards of prejudgment interest for breach of fiduciary duty. The court concluded that the "common thread" is that prejudgment interest is available when "the fiduciary wrongfully withheld money from the injured party." The court ultimately found that Chicago Title itself did not wrongfully withhold money from Founders, the injured party here, so the court did not award prejudgment interest. The FDIC argues that there is no "wrongful

withholding" requirement for prejudgment interest awards under Illinois law.

There is no express requirement that the unfaithful fiduciary have wrongfully withheld money from the plaintiff, but the district court correctly observed that it is a nearly universal feature in the Illinois fiduciary cases awarding prejudgment interest. The Illinois Supreme Court in *Wernick* reversed a denial of prejudgment interest where the defendant deprived the plaintiff use of funds for a time. *Wernick*, 127 Ill. 2d at 87, 535 N.E.2d at 888 (victim should receive interest "when money has been wrongfully withheld"). In *DiMucci*, the court found bad faith where the defendant had withheld money for a time. The court acknowledged that while "bad conduct is not a precise requirement" for an award of prejudgment interest, "the cases suggest that some element of bad conduct must be present." *National Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1048 (Ill. App. 2015) (affirming award of prejudgment interest "for the deprivation of the funds all these years") (cleaned up).

In *Wolinsky v. Kadison*, 987 N.E.2d 971, 990 (Ill. App. 2013), the Illinois Appellate Court concluded that the defendant was not entitled to summary judgment on prejudgment interest because the plaintiff claimed the defendant's breach of fiduciary duty had deprived her of the use of her money. The court remanded for the trial court to determine whether to award interest. And in *Wilson v. Cherry*, 612 N.E.2d 953, 958 (Ill. App. 1993), the court ultimately denied prejudgment interest because the case was a negligence action but acknowledged that even where the wrongdoer does not explicitly benefit, the injured party "suffers detriment from the lack of use of the

money … because of the inability to use the money … until the day compensation is paid."[9]

While the relevant Illinois cases do not include an explicit "wrongfully withheld" *requirement*, wrongful withholdings are generally present where Illinois courts award prejudgment interest on fiduciary duty claims. No showing was made here of a withholding of funds. We do not read Illinois cases as *requiring* prejudgment interest in a fiduciary case like this one, where the fiduciary enabled others to defraud the victim. While we can imagine that Illinois courts may choose to move in that direction, they have not done so yet. The district court did not abuse its discretion in denying the FDIC's request for prejudgment interest.

IV. *The Motion to Amend the Judgment*

The district court also denied the FDIC's motion under Federal Rule of Civil Procedure 59(e) to amend the judgment to increase the damages awarded by the jury verdict. The FDIC argued that if it proved liability, as it did, its damages should be for the full amount of the deficiency judgments established at trial. Recall that the jury awarded the full

---

[9] See also *Movitz*, 982 F. Supp. at 570 ("Generally, courts grant an equitable award of prejudgment interest when they find that the fiduciary has wrongfully withheld money from the injured party."); *Wehrs v. Benson York Grp., Inc.*, 2011 WL 4435609, at *8 (N.D. Ill. Sept. 23, 2011) (declining to award prejudgment interest because fiduciary "received no financial benefit from his wrongdoing"). The FDIC also relies on *Prignano*, where the defendant held the plaintiff's money for a time and the court noted that "the evidence at trial supported the award of prejudgment interest" because of the presence of wrongful withholding. 934 N.E.2d at 110. Because such wrongful withholding was not shown here, however, *Prignano* does not help the FDIC.

deficiency judgment amounts for two properties but substantially lesser amounts for the other two. The district court denied the motion, reasoning that the jury may have determined that some events after the transaction closings warranted a reduction in the damages. "There was sufficient evidence presented by Chicago Title for the jury to have concluded that unforeseeable acts following the close of the transactions impaired two of the properties' value." The FDIC argues that because the jury found that Chicago Title's conduct was a proximate cause of the FDIC's injuries, the district court erred in concluding that evidence of intervening or superseding causes could have supported the jury's reduction in damages.

The standard of review is abuse of discretion: "The decision whether to grant or deny a Rule 59(e) motion is entrusted to the sound judgment of the district court, and we will reverse only for an abuse of discretion." *Matter of Prince*, 85 F.3d 314, 324 (7th Cir. 1996). The issues of causation were murky enough in this case to persuade us to leave this question to the sound discretion of the district court. The Founders loans blew up in the midst of the Great Recession, and significant construction costs interfered with the intended plans to convert the properties into condominiums, leaving room for fair debate and for the jury's exercise of common sense in deciding how to assess loss and causation. We find no abuse of discretion on this question.

The court instructed the jury on proximate cause: "It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." Concluding that a defendant's action was a proximate cause does not foreclose additional or combined causes. "There may be more than one proximate cause of an injury." *Bentley v.*

*Saunemin Township*, 83 Ill. 2d 10, 17, 413 N.E.2d 1242, 1246 (1980); see also *Lipke v. Celotex Corp.*, 505 N.E.2d 1213, 1221 (Ill. App. 1987) ("Illinois courts have long recognized that there can be more than one proximate cause of an injury.").[10]

The FDIC relies on *Chapman*, where the Illinois appellate court remarked: "The existence of proximate cause precludes the possibility of superseding cause." *Chapman v. Baltimore & Ohio R.R. Co.*, 92 N.E.2d 466, 473 (Ill. App. 1950). But there, the court was discussing when intervening causes may entirely relieve a defendant of wrongdoing: "An intervening cause, if it is to be sufficient in law to relieve the original wrongdoer, is inadequate when it merely combines or concurs with the operation of such negligence to produce a joint effect." *Id.* A defendant may thus be held responsible as a proximate cause of damages even if a later intervening cause produces a joint effect with the negligence of the defendant. The *Chapman* court clarified: "To constitute proximate cause, a negligent act or omission need not be the sole cause … even though other causes … combined with such negligence to produce the ultimate result." *Id.* at 471–72 (citation omitted).

The combination of the specific transactions in this case and larger events in the regional, national, and global

---

[10] In *Movitz*, we addressed a similar issue, the difference between transaction causation and loss causation. "Transaction causation" refers to the loss from the transaction itself, and "loss causation" refers to the total loss including even losses that may not have been in defendant's control to cause in the first place. We concluded that the plaintiff was not necessarily entitled to all damages even if a defendant was a proximate cause of the transaction loss because the defendant did not proximately cause the portion of loss resulting from a more general market turndown and other external forces. 148 F.3d at 763.

economies made measurement of damages a complex factual issue. The district court did not abuse its discretion in concluding there was sufficient evidence for the jury to conclude that unforeseeable events after the transaction closings impaired two of the properties' values, so that the jury could find both that Chicago Title proximately caused Founders' injuries but that the FDIC was not entitled to recover every penny it lost from Chicago Title. The district court also did not abuse its discretion in concluding that the jury could not award damages in excess of the respective deficiency judgments. *F.D.I.C. v. Chicago Title Ins. Co.*, 2015 WL 5276346 (N.D. Ill. Sept. 9, 2015).

V.  *Granting the Setoff*

We disagree, however, with the district court's handling of one issue. The district court found that Chicago Title was entitled to a setoff of $500,000 from the total verdict, reflecting the amount that former co-defendant PVS agreed to pay the FDIC in a settlement. The FDIC argues that Chicago Title was not entitled to this setoff because it failed to carry the burden of proving that any portion of the settlement sum was attributable to the same injuries for which Chicago Title was found liable. We agree with the FDIC on this issue.

Whether defendant is entitled to a setoff is a question of law that we review de novo. *Thornton v. Garcini*, 237 Ill. 2d 100, 115–16, 928 N.E.2d 804, 813 (2010). When an appellate court turns to the details of attributing damages to different injuries, the standard of review relaxes to look for only an abuse of discretion. *Pasquale v. Speed Prods. Engineering*, 166 Ill. 2d 337, 369, 654 N.E.2d 1365, 1382 (1995).

The question of setoffs in Illinois is governed by Section 2(c) of the Illinois Joint Tortfeasor Contribution Act:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater.

740 ILCS 100/2(c). Section 2(c) "ensures that a nonsettling party will not be required to pay more than its *pro rata* share of the shared liability." *Pasquale*, 116 Ill. 2d at 368, 654 N.E.2d at 1382. "[W]hen a settlement release is given in good faith to one tortfeasor … it … reduces 'the recovery' on any claim against them to the extent of the amount stated in the release or actually paid for it." *Id.* at 367–68, 1381.

Because a setoff is intended to prevent double recovery, a full setoff may be awarded only where the settlement covers the same injury as that for which the non-settling defendant was found responsible. A full setoff may not be awarded where a settlement covers multiple injuries, for at least one of which both defendants are jointly responsible, but for at least one of which the non-settling defendant is not responsible. *Thornton*, 237 Ill. 2d at 116–17, 928 N.E.2d at 813–14 (settlement covered a greater subset of injuries than the jury award did, so allocation was needed between joint and non-joint injuries among defendants).

The critical point in this case is that, where there may arguably be both joint and non-joint injuries, the non-settling defendant bears the burden of proving the allocation of settlement proceeds between them. *Id.* at 117, 814. Chicago Title failed to meet that burden.

Chicago Title argues there was only one joint injury, the injury that arose from Founders' losses from the loans. Yet the district court's pretrial decision limiting damages against Chicago Title to the amounts of the deficiency judgments held in effect that the FDIC was asserting both joint and non-joint injuries. The court distinguished between the foreclosure deficiency judgments, which could be deemed joint injuries caused by both Chicago Title and PVS, and the post-foreclosure construction costs and net losses on final sales, which could have been caused only by PVS.

We must acknowledge that the district court said that the FDIC "misconstrue[d] the Court's ruling" limiting damages to the deficiency judgments and asserted that it "did not hold that there were two injuries." Instead, the district court wrote that it "addressed and rejected the FDIC's arguments that Chicago Title was responsible for losses attributable to PVS's second set of appraisals" but "never adopted a two-injury framework." The court expressed then "no opinion regarding whether the full credit bid rule bars recovery in excess of the deficiency judgments from PVS" and said that it "did not bifurcate Founders Bank's injury."

After the trial, when Chicago Title asked for the setoff, the district court concluded that no allocation was required, "notwithstanding the plaintiff's assertion of two distinct theories of recovery." See also *Pasquale*, 116 Ill. 2d at 368–69, 654 N.E.2d at 1382. The district court found at that point that the

settlement with PVS and the jury's damage awards against Chicago Title involved the same injuries, and that the FDIC's negligent misrepresentation and contract claims against both PVS and Chicago Title rendered both potentially liable in tort under the Illinois statute.

We are not convinced that the district court's two decisions can be reconciled with each other. Illinois cases across a range of settings show that the Illinois statute applies broadly to joint tortfeasors and that the burden is on the defendant seeking setoff to establish allocation where there are joint and non-joint injuries or theories of recovery. "Generally, a non-settling party seeking a setoff bears the burden of proving what portion of a prior settlement was allocated or attributable to its share of the liability." *Thornton*, 237 Ill. 2d at 116, 928 N.E.2d at 813; see also *Pasquale*, 166 Ill. 2d at 369, 654 N.E.2d at 1382 (same); *Muro v. Abel Freight Lines, Inc.*, 669 N.E.2d 1217, 1218 (Ill. App. 1996) ("A defendant seeking a set off bears the burden of establishing the exact amount of the settlement the plaintiff received.") (citation omitted).[11] "If a defendant is unable to establish the amount allocated to a plaintiff's individual theories of recovery, he will not receive a set off." *Muro*, 669 N.E.2d at 1218, citing *Dolan v. Gawlicki*, 628 N.E.2d 1188, 1190 (Ill. App. 1994) ("We conclude that *Barkei* and *Kipnis* stand for the proposition that a court may not set off

---

[11] See also *Valley Air Serv., Inc. v. Southaire, Inc.*, 432 F. App'x 602, 606 (7th Cir. 2011). The case is non-precedential, but we agree with its reasoning on this point. *Valley Air* affirmed denial of a setoff where the defendant made no effort to apportion the settlement between injuries in a case with multiple theories (tort and contract, as here). We said the "burden is on the defendant seeking set-off to establish the amount that should be allocated to each individual theory of recovery."

settlement amounts *unless* the court has made a previous al-
location of the damages for particular claims."), and *Barkei v.
Delnor Hospital*, 565 N.E.2d 708, 715 (Ill. App. 1990) (conclud-
ing that because the party seeking a setoff failed to demon-
strate apportionment of the settlement between joint tortfea-
sors, the trial court properly refused to grant a setoff).

The district court's post-trial rejection of the existence of
both joint and non-joint injuries in this case made its two de-
cisions inconsistent. We think the district court was right in its
pretrial decision to limit the FDIC's recovery from Chicago
Title under the credit bid rule. That ruling had the effect of
cutting off potential Chicago Title liability for post-foreclo-
sure losses. And that logic effectively created categories of
joint and non-joint injuries as between Chicago Title and PVS.
The parties did not contribute in the same way to the loan
losses before and after the foreclosures. Chicago Title bore the
burden of establishing the amount that should be allocated to
each type of injury. It made no effort to meet that burden, so
the setoff was not appropriate.

\* \* \*

To sum up, we AFFIRM the district court's denial of pre-
judgment interest and its denial of the FDIC's motion to
amend the judgment, but we REVERSE the grant of a setoff to
Chicago Title. We REMAND the case to the district court for
modification of the judgment to eliminate the $500,000 setoff.

KIRSCH, *Circuit Judge,* concurring in part and dissenting in part. I agree with the majority on the motion to amend and setoff issues. I therefore concur in affirming the district court's denial of the FDIC's motion to amend the judgment, and in reversing and remanding the district court's grant of a setoff to Chicago Title. I write separately on the statutory interpretation question. The majority concludes that 12 U.S.C. § 1821(*l*), a damages provision in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), gave the district court discretion to deny prejudgment interest to the FDIC, effectively changing "shall include" in the statute to "may include." I disagree.

It is well established that when interpreting a statute, "we look first to its language." *United States v. Monsanto*, 491 U.S. 600, 606 (1989) (quotation omitted). When the language's "plain meaning is unambiguous, our inquiry ends there." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020). Section 1821(*l*) states that in a suit like this, where it has been determined that damages resulted from the improvident or otherwise improper use or investment of an insured depository institution's assets, the aggrieved party's "recoverable damages … shall include principal losses and appropriate interest." The plain meaning of § 1821(*l*) is unambiguous: since damages "shall include" interest, an award of prejudgment interest is mandatory, not discretionary, under FIRREA.[1] Cf.

---

[1] Everyone apparently agrees that the statute's reference to "interest" includes prejudgment interest even though the statute doesn't specifically say so. See *Grant Thornton, LLP v. FDIC*, 435 F. App'x 188, 206–07 (4th Cir. 2011); see also Appellant's Reply Br. at 5 (noting "[a]ll courts to address the issue—including *Grant Thornton* and the district court below—have

*Monsanto*, 491 U.S. at 607 (in 21 U.S.C. § 853(a), which states that a convicted person "shall forfeit … any property" derived from the person's offenses of conviction, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory"). Indeed, since the statute does not define "shall," we interpret the word based on its "ordinary, contemporary, [and] common meaning by looking at what [it] meant when the statute was enacted, often by referencing contemporary dictionaries." *Melvin*, 948 F.3d at 852. And when "shall" is used in both statutes and everyday language, it consistently means that something "is required." *Shall*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("This [definition] is the mandatory sense that drafters typically intend and that courts typically uphold."); see *Shall*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/shall (last visited Aug. 12, 2021) ("shall" is "used in laws, regulations, or directives to express what is mandatory"); *Shall*, BALLENTINE'S LAW DICTIONARY (3d ed. 2010) ("where appearing in a statute," the word "shall" is "[o]rdinarily, a word of mandate, the equivalent of 'must'"); see also *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (recognizing that "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion").

In holding that the district court could exercise its discretion to deny interest under § 1821(*l*), the majority disregards the plain meaning of "shall" and instead interprets the statute's mandatory "shall" as a discretionary "may." If Congress wanted interest to be discretionary under the statute, it could have said that damages "may" (instead of "shall") include

concluded that Section 1821(*l*)'s reference to interest addresses prejudgment interest," and neither party denies this).

interest. See *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). Alternatively, it could have remained silent on the matter of prejudgment interest. But that's not how Congress wrote the statute.

In addition to dictionary definitions, we often consult grammar to discern a statute's plain meaning. See *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1484–85 (2021). Under the majority's reading, not only does "shall" not mean "shall," but the term "appropriate" is no longer an adjective. By immediately preceding the word "interest," the term "appropriate" is used as an adjective to describe what kind of interest is mandatory under the statute ("appropriate interest")—just as the adjective "principal" describes what kind of losses are mandatory ("principal losses"). In other words, the statute's use of "shall" tells us *when* interest must be included under the statute (always, because "shall" means that it's mandatory), whereas "appropriate" tells us *what* interest is required (again, "appropriate interest"). Yet the majority concludes— relying on an unpublished Fourth Circuit opinion, see *Grant Thornton, LLP v. FDIC*, 435 F. App'x 188 (4th Cir. 2011)[2]—that

---

[2] This is the only other federal appellate case to directly address whether § 1821(*l*) makes an award of prejudgment interest mandatory or discretionary. But two published cases from the Fifth and Tenth Circuits that did not specifically analyze the issue seemed to assume that an award of prejudgment interest was mandatory under § 1821(*l*). See *FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1387–88 (10th Cir. 1998) (indicating that prejudgment interest is mandatory under FIRREA: "In the absence of FIRREA, state law governs the availability of prejudgment interest on the breach of fiduciary duty claim." And "[b]ecause FIRREA is inapplicable, the district court was charged with deciding whether prejudgment

"appropriate" tells us when and not what interest is required. See *supra*, at 13 ("the word 'appropriate' 'is best read as a limitation as to *when* prejudgment interest should be provided'") (emphasis added) (quoting *Grant Thornton*, 435 F. App'x at 208). In so doing, the majority transforms "appropriate" from an adjective that modifies the noun "interest" to an adverb that modifies the verb "shall include," and the majority concludes that when the statute is read accordingly, § 1821(*l*) provides that the district court may in its discretion award interest if it's appropriate. The majority's reading, however, diminishes instead of gives effect to the word "shall," see *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 100 (1992) (courts have a "duty to give effect, if possible, to every clause and word of a statute") (quotation omitted), and does not square with the statute's grammatical structure.

Nor can the majority's speculations about "why Congress added the 'appropriate' qualifier" in the statute, see *supra*, at 13, prevail over the plain meaning of § 1821(*l*)'s terms. The "best evidence" of Congress's purpose in enacting a statute

---

interest was available under pre-existing law."); *FDIC v. Mijalis*, 15 F.3d 1314, 1326 (5th Cir. 1994) (indicating that "appropriate" in an adjective modifying "interest" and not an adverb modifying "shall include": "[FIRREA] provides that the FDIC shall be able to recover 'appropriate interest' as damages against liable directors and officers of insured depository institutions. 12 U.S.C. § 1821(*l*). Unfortunately, case law addressing *the appropriate rate of interest* to be awarded is, to say the least, sparse.") (emphasis added); see also *FDIC v. Moll*, 848 F. Supp. 145, 148 (D. Colo. 1993) (concluding § 1821(*l*) "provides that the FDIC is entitled as a matter of law to recover 'appropriate interest' on its losses," and finding that FDIC's proposed rate of 8% interest was appropriate under that case's facts and also consistent with Colorado's statutory prejudgment interest rate).

"is the statutory text adopted by both Houses of Congress and submitted to the President." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), superseded by statute on other grounds, 42 U.S.C. § 1988. Where, as here, the statute's text is plain and unambiguous, "the sole function of the court is to enforce it according to its terms." *Id.* at 99 (quotations omitted). The majority's beliefs about what "Congress could easily have concluded" in passing § 1821(*l*) are therefore immaterial.[3] See *supra*, at 13. Whatever Congress might have concluded cannot overcome what Congress in fact drafted in the statutory text. See *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986) ("Courts should confine their attention to the purposes Congress sought to achieve by the words it used. We interpret texts. The invocation of disembodied purposes, reasons cut loose from language, is a sure way to frustrate rather than implement these texts."). What Congress said in § 1821(*l*) is that a court "shall" award "appropriate" prejudgment interest. The most natural conclusion about what Congress meant in stating that a court must award "appropriate"

---

[3] The majority opines that in FIRREA cases, where the FDIC steps into the shoes of a failed bank as receiver to generally work out its claims under state law, Congress could easily have concluded that since such cases arise all over the nation under the laws of every state, a one-size-fits-all approach to awarding prejudgment interest would not be appropriate. *Id.* Thus, the majority reasons, Congress likely used the "appropriate" qualifier to provide "a workable delegation to courts to exercise sound discretion" to determine whether it is appropriate for them to award prejudgment interest in a given case after considering all relevant circumstances. *Id.* Congress could just as easily have concluded that prejudgment interest should be mandatory in FIRREA cases because if it wasn't, the FDIC might be denied prejudgment interest in some states depending on which state's law governs the case. Who's to say Congress didn't want to take away courts' discretion to deny prejudgment interest, to avoid such a result?

interest is that a court must include in the aggrieved party's damages an amount of prejudgment interest that is proper (or "appropriate") to fully compensate that party under the circumstances.

This makes sense: making sure that the aggrieved party is wholly compensated is the purpose of prejudgment interest. See, *e.g.*, *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995) (the "rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss"); *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."); see also *supra*, at 12 (agreeing that "prejudgment interest is usually an ingredient of full compensation" "because '[c]ompensation deferred is compensation reduced by the time value of money'") (citation omitted). That's why, as the majority notes, "this court has long applied a presumption in favor of awarding prejudgment interest" to victims of at least federal law violations. *Id.* at 11. "'Without it, compensation of the [aggrieved] plaintiff is incomplete and the defendant has an incentive to delay.'" *Id.* (quoting *Gorenstein Enters. Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989)); see also *Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir. 1992) (per basic economic principles, "[m]oney today is not a full substitute for the same sum that should have been paid years ago").

The purpose of prejudgment interest therefore demonstrates that § 1821(*l*)—which is entitled "Damages" and states an aggrieved party's recoverable damages "shall" include not

just "principal losses" but also "appropriate interest"—is best read as evincing a strong compensatory purpose, which further confirms that § 1821(*l*) makes an award of prejudgment interest mandatory. As such, it should not be read to grant courts discretion to decide whether to award prejudgment interest at all, as the majority holds. See *NLRB v. Lion Oil Co.*, 352 U.S. 282, 289 (1957) (a construction that does not serve a statute's purpose "is to be avoided unless the words Congress has chosen clearly compel it").

Though the statute clearly mandates that a proper amount of prejudgment interest be included in an aggrieved party's compensatory award to make that party whole, the statute leaves open how to calculate the amount of prejudgment interest necessary to make the party whole. Since neither the district court nor the majority determined that an award of prejudgment interest to the FDIC was required, they did not reach what rate of interest was "appropriate" to award the FDIC. Although I likewise do not reach the issue, it may be that it is within the district court's discretion to look to multiple sources, including state law, for guidance to determine the prejudgment interest rate.

Indeed, nothing in § 1821(*l*) suggests that it would be improper for district courts to look to state prejudgment interest rates and accrual periods for guidance in computing a proper amount of prejudgment interest to fully compensate the FDIC for its losses.[4] In *Gross v. Sun Life Assurance Co. of Canada*, the

---

[4] Each state has its own law, usually a statute, indicating the interest rate and accrual date the state uses to calculate prejudgment interest. See, *e.g.*, COZEN O'CONNOR, JURISDICTIONS COMPARATIVE CHART: PRE/POST JUDGMENT           INTEREST           1–10           (2015),

First Circuit held that in ERISA cases,[5] district courts have broad discretion to select the rate of interest, "with the choice to be guided by equitable factors" so as to identify "a fair percentage reflecting both the rationale of full compensation and ERISA's underlying goals." 880 F.3d 1, 19–21 (1st Cir. 2018) (quotations and citation omitted) (distinguishing between proper and improper interest rate calculations). In exercising this "broad discretion to select the rate," the First Circuit endorsed district courts looking "to outside sources, including state law, for guidance." *Id.* at 20 (quotations and citation omitted). Similarly in *Towerridge, Inc. v. T.A.O., Inc.*, the Tenth Circuit explained that in cases arising under the federal Miller Act,[6] the district court, in fixing a prejudgment interest award, was "free to choose any interest rate which would fairly

---

https://www.cozen.com/admin/files/publications/pre_post_judgment_interest_jurisidctional_chart.pdf (collecting states' prejudgment interest laws).

[5] Unlike FIRREA, "ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993). In exercising its discretion over whether (or *when*) to grant such interest in ERISA cases, the district court applies federal common law. See *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000).

[6] Like in ERISA cases, in cases under the Miller Act, "[t]he decision whether … to allow prejudgment interests rests within the sound discretion of the trial court." *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 763 (10th Cir. 1997). The district court applies federal common law in exercising such discretion. See *id.* at 764 (the "allowance of prejudgment interest in cases arising under the Miller Act is a matter of federal law," determined by considering whether an award of prejudgment interest would serve to compensate the injured party and whether the equities would preclude prejudgment interest).

compensate the plaintiff for the delay in the receipt of pay-
ment," including the state interest rate. 111 F.3d 758, 764 (10th
Cir. 1997) (quotation and citation omitted). So, in cases involv-
ing other federal statutory schemes, it is not unusual for dis-
trict courts to look to federal law to determine whether pre-
judgment interest should be awarded and to state law for
guidance in determining the appropriate rate of interest to
make the aggrieved party whole. Thus, in FIRREA cases,
while a district court might have discretion to consider state
law to determine *what* interest rate is equitable and in line
with the compensatory purposes of § 1821(*l*), that would not
impact the preliminary conclusion that the district court lacks
discretion to determine the permissibility of the prejudgment
interest award (or *when* prejudgment interest is appropri-
ate)—since, as discussed, FIRREA unambiguously resolves
that question.

I would hold that the district court erred in denying pre-
judgment interest to the FDIC, and I would remand to the dis-
trict court to determine the rate of prejudgment interest.